POMPEY (UNITED STATES v.). See Case No. 16,066.

POND (RENWICK v.). See Case No. 11,702.

POND (STIMPSON v.). See Case No. 13,455.

POND (UNITED STATES v.). See Case No. 16,067.

---

## Case No. 11,264.

POND et al. v. VERMONT VAL. R. CO. et al.

CHASE et al. v. SAME.[1]

Circuit Court, D. Vermont. Oct. 19, 1876.

CORPORATIONS—AUTHORITY TO LEASE THEIR PROPERTY—VOTE OF DIRECTORS—BOARD RESOLUTIONS WHICH PRECEDE COMPLETION OF ORGANIZATION—RIGHTS OF HOLDERS OF NEWLY-ISSUED STOCK—REGULARITY OF ELECTIONS—WHAT AMOUNTS TO A BINDING LEASE.

[1. A vote by directors of a corporation authorizing its officers to make a lease of its property does not compel them to take such action, and confers no rights upon the prospective lessee.]

[2. Trustees under a foreclosed railroad mortgage, who, in view of the organization by the bondholders of a new corporation to take over the property as provided by the laws of Vermont, discuss and agree upon a lease of the railroad to another company, do not thereby make a binding lease, nor do they estop one of their number to deny such a lease.]

[3. Resolutions of directors, authorizing a lease of the corporation's property, which have never been drawn in question by the board, are valid, although they precede the completion of the organization by filing the articles of association with the proper state officer.]

[4. Holders of newly-issued stock, if in a majority, may revoke a delegated authority to officers to lease the property of the corporation.]

[5. The regularity of corporate elections, and the title to corporate offices, may be inquired into by a court of equity, when necessary to complete justice in a pending suit.]

[6. An attempt by directors to defeat the rights of holders of newly-issued stock by postponing for six months the annual stockholders' meeting is not valid under a by-law fixing the time for such meeting in the month of June, "or at such other time as the directors may order."]

[These were bills in equity by George B. Chase and others against the Vermont Valley Railroad Company of 1871 to establish a lease; and by Charles M. Pond, survivor, and others, against the Vermont Valley Railroad Company of 1871, the Rutland Railroad Company, the Central Vermont Railroad Company, and others, for the cancellation of said lease, and other auxiliary

---

relief. The jurisdiction of the court was heretofore sustained. Case No. 11,265. The cases are now on final hearing.]

JOHNSON, Circuit Judge. The decision of this court made by Judge Woodruff in the first of the above-entitled causes established two propositions: The one, that the case disclosed by the plaintiffs belonged to the cognizance of courts of equity; the second, that the plaintiffs were entitled to assert their equities in this court. Those propositions are consequently out of the field of debate, upon this final hearing of both causes. Assuming them to be established, the question in each case now is whether, upon the proofs, a case in equity is made out in favor of the plaintiffs.

The contest in each case relates to the control of the railroad of the Vermont Valley Railroad Company of 1871.

In the Chase and Butler suit, which was commenced in August, 1873, the plaintiffs, as shareholders in the said railroad company, asked a decree against that company establishing a lease, or an agreement for a lease, to the Rutland Railroad Company, for a period of 20 years from the expiration of a prior term of 10 years, which would expire on the 1st of June, 1875. In this suit only the Vermont Valley Railroad Company of 1871 is defendant. In the Pond suit, which was commenced in January, 1874, not only the Vermont Valley Railroad Company of 1871, but also the Rutland Railroad Company and the Central Vermont Railroad Company, and two sets of persons who claim to be directors of the Vermont Valley Railroad Company of 1871, are made defendants.

The relief sought by the bill is that the extended or new lease before mentioned may be given up or canceled, and that the Vermont Valley Railroad Company of 1871, and one set of the persons who claim to be directors of that company, being those who support the validity of the lease, or the pretensions of the Rutland Railroad Company to be entitled to a lease, viz. Page, Butler, Chase, Prout, Williams, and Slate, be perpetually enjoined from executing any lease of the road, unless it shall first have been authorized by a legal vote of the stockholders of the company at a meeting duly called and holden for that purpose, and also that the road itself, and the moneys and personal property belonging thereto, may be decreed to be surrendered, by such of the defendants as may hold and control the same, to the company, at such time as it should be entitled thereto, or to a receiver to be appointed by the court. The lease referred to in both bills is dated August 8, 1871, and is shown to have been executed, in so far as an execution had taken place, on the 7th of November, 1872. The parties named are the Vermont Valley Railroad Company of 1871, as lessor, and the Rutland Railroad Compa-

ny, as lessee. The clause of execution is: "In testimony whereof, the said Vermont Valley Railroad Company of 1871, Governeur Morris & James H. Williams, their agents, duly authorized in that behalf, as appears by the vote or votes of said corporation, have caused the seal of said corporation to be hereto affixed, and the said Morris & Williams, for said Vermont Valley Railroad Company of 1871, have subscribed their names the day and year first above written." Beneath is affixed the seal of each corporation, and the signatures, "Vermont Valley Railroad Company of 1871, by J. H. Williams, Treasurer," "Rutland Railroad Company, by J. B. Page, President." Mr. Morris' signature, called for by the testimonium clause, is not put to the instrument. Its execution, therefore, appears to be imperfect inasmuch as a joint authority to two is recited, and but one appears to have acted. The only formal corporate action proved to sustain the execution of the instrument consists in the resolutions of July 3, 1871, and of November 7, 1872. In each of these, the authority conferred to execute a lease is given to the president and treasurer of the corporation. The resolutions are "that the president and treasurer of this corporation be authorized, and they are hereby authorized, to execute and deliver to the Rutland Railroad Company a lease," etc.

Leaving out of view all other questions in respect to this corporate action, it is plain that the authority to the two officers is joint, that neither alone has power to execute, and that the instrument executed by one alone does not bind the corporation, and is to be regarded, for legal purposes, as an unexecuted and inoperative instrument. Assuming it to be established that no lease has been executed, extending the right of the Rutland Railroad Company to a further term in the Vermont Valley Railroad beyond the period limited by the lease to Birchard and Page, the question arises whether, out of the matters which have occurred, an equitable right has accrued to the Rutland Railroad Company, or its assignees, to have such a lease executed.

Looking to the corporate action of the Vermont Valley Railroad of 1871, there are but two votes of the directors of the company which directly relate to the matter. These are the votes of July 3, 1871, and of November 7, 1872. In respect to the first, it is objected that it was adopted before the actual completion of the corporate organization by the filing of the articles as required by law. In regard to the second, it is insisted that the vote was ineffectual by reason of the vote at a previous stockholders' meeting, held on the 3d of September, 1872. It is, however, not necessary, at least, for the present, to consider these special grounds of objection, because, in my opinion, the two votes of July 3, 1871, and November 7, 1872, are only proof of authority conferred upon the president and treasurer to make a lease, and not proof of an agreement for a lease, obligatory upon the corporation. The language of the vote of July 3, 1871, is: "Voted, that the president & treasurer of this association be, and they are hereby, authorized to execute and deliver to the Rutland Railroad Company, with the usual covenants, a lease of the Vermont Valley Railroad Company of 1871, with all its property, for a period not exceeding 20 years, at the rate of $72,000 per annum, payable monthly, and taxes; said lease to take effect from and after the expiration of the lease of the same property to Birchard & Page." The vote of November, 1872, is to the same effect, and in substantially the same terms. These votes are merely indicative of the corporate delegation of power, to the individual officers designated, to execute and deliver such an instrument as is mentioned. No duty purports to be imposed upon them. The conferring of authority is quite distinguishable from directing its exercise. A power of attorney by an individual to another, to make a deed in his name, does not operate as a contract, or as evidence of a contract, in favor of a proposed grantee. It at least remained for the designated officers to settle, according to their own judgments, what "the usual terms" were, that are referred to in the votes. No engagement was, by the adoption of these votes, entered into with the Rutland Railroad Company, nor does that company appear to have entered into any corresponding engagement with the Vermont Valley Railroad Company of 1871. The transaction was internal entirely,—neither addressed nor authoritatively communicated to any one outside of the corporation,—and could, therefore, have no more effect in favor of another party than a private person's power of attorney, or his own unexpressed thoughts. Nor is this altered by the fact that among the directors adopting these votes were both stockholders and directors of the Rutland Railroad Company. Knowledge or notice thus obtained will not inure to bind the Vermont Valley Railroad Company of 1871 in favor of the Rutland Company. The whole direct action of the corporation in regard to the new lease has now been stated, and it is deemed to be established that no lease, and no corporate contract for or assent in writing to such a lease, has been made out. A right to such a lease is attempted to be made out on other grounds, to which attention must now be given.

The road about which this controversy is carried on was built by an earlier corporation,—the Vermont Valley Railroad Company. It was subject to two mortgages made by that company,—the first, of $500,000; and the second, of $300,000. In September, 1864, a decree of foreclosure upon the first of these mortgages was made by the court of chancery in Vermont in favor of the trustees under that mortgage, and the time limited for the

payment to them of the principal of those bonds was fixed at the 1st of October, 1872, provided the interest was punctually paid in the meantime. In default of these payments being made to the trustees, the foreclosure was declared absolute. Until the payment, the exclusive possession, control, and management of the mortgaged property was awarded to the trustees. Subsequently, and by deed dated May 12, 1865, and acknowledged May 26th, the trustees leased the road, and all the property belonging to it, to Birchard and Page, for 10 years from June 1, 1865, at a rent of $60,000 a year, payable monthly, in equal parts. The lease recites that the trustees were then in possession as such, and also under a deed of surrender executed to them September 11, 1865, by the Vermont Valley Railroad, in pursuance of a resolution of the stockholders authorizing and requiring the directors to make such surrender, as well as by the decree before mentioned. The lease was assented to in writing by the holders of over $300,000 of the first mortgage bonds, also by the holders of over $260,000 of the second mortgage bonds. It was ratified and confirmed in writing by the trustees of the second mortgage bonds. The directors of the railroad also voted to ratify and confirm the same, and finally, in stockholders' meeting held August 9, 1865, it was, by resolution, unanimously adopted, again ratified, and confirmed. Under this lease the road was operated by the lessees, or their assigns, so long as the term continued.

In the meantime a suit was instituted in the court of chancery in Vermont, by the trustees of the second mortgage, to foreclose that mortgage. On the 16th of October, 1869, a decree was made in that suit declaring that on the 1st of October, 1869, there was due on the bonds secured by the mortgage, including interest, $641,923.29, and ordering that sum, with interest, to be paid to the trustees, for the benefit of the bondholders, on or before October 1, 1870, with costs of suit, and that in default of such payment the equity of redemption should be foreclosed, and the trustees should hold the mortgaged premises, with power of sale, and should administer the mortgaged property under the mortgage and decree for the benefit of the second mortgage bondholders. The money not being paid by the day limited, the decree in favor of the trustees of the second mortgage bondholders became absolute on the 1st of October, 1870. But their rights were subject to the first mortgage, and to the decree which had been pronounced upon it, by force of which those rights would be extinguished if the required payments upon the first mortgage were not made by the 1st of October, 1872. At this time the trustees under both mortgages had come to be the same persons, viz. Morris, Page, and Williams; and the two latter were also directors of the ·Rutland Railroad Company, of which Page was also president.

In this situation of affairs the series of acts and transactions commenced and were carried on which it is now claimed, on the one side, and denied, on the other, resulted in giving to the Rutland Railroad Company the right to a further lease for 20 years of the Vermont Valley Railroad, to begin after the expiration of the lease to Birchard and Page. The first step which appears to have been taken was the adoption on the 3d of December, 1870, by the Rutland Railroad Company, of a resolution that "Mr. Barnes be a committee on behalf of this corporation authorized to take a lease of the Vermont Valley Railroad Company for a term not exceeding twenty years, providing a satisfactory arrangement can be made to do so." And this, it should be observed, was the only resolution or authority adopted or given by the Rutland Railroad Company in respect to a new or extended lease of the Vermont Valley road, so far as the record discloses. The directors present at this meeting were Page and Birchard, the lessees in the then existing lease; Butler, Chase, and Williams, afterwards directors of the Vermont Valley Road of 1871; and Lawrence Barnes, mentioned in the resolution. Ten days afterwards, on the 13th of December, 1870, the trustees of the Vermont Valley second mortgage (Morris, Page, and Williams) adopted a resolution reciting that the decree of foreclosure had expired on the 1st of October, then past, and voting to proceed to organize the same into a corporation under the laws of Vermont, with a capital or joint stock of $500,000, and that Judge Prout draw up articles of association necessary to perfect said organization. Under the laws of Vermont (Gen. St. c. 28, § 104), after the foreclosure of a railroad mortgage, and the vesting of the legal title in the mortgagees, any number of persons holding a majority in amount of the principal of the bonds so secured are authorized to form themselves into a corporation to operate and maintain the railroad, or part thereof, for public use in the conveyance of persons and property. The resolution last mentioned was rather a declaration of the purpose of the trustees to favor and promote such a reorganization, than an effectual step in the new organization, since the power to act was not in the trustees, but in the bondholders.

It is alleged that all the trustees were agreed in the purpose of getting or giving an extended lease of the Vermont Valley road in favor of the Rutland road; but it appears that Morris, when it was proposed that the trustees under the first mortgage should take action with that view, objected, on the ground, in substance, that such action would be premature until the foreclosure under that mortgage should become absolute. In respect to the action of the trustees under the second mortgage, which was also proposed, Morris seems to have suggested that the action ought to be taken by the new corporation. As the trustees under both mortgages

were the same persons, and as two of them were directors of the Rutland road, of which Page was also president, it is easy to understand that the meeting between both sets of trustees and the Rutland Railroad Company on the 13th of December, 1870, may not have involved the presence of any one except the three named persons, and that, while the talk of all of them may have been not unfavorable to the idea of an extended or new lease, yet that anything in the way of action upon the subject was declined by Morris, and not undertaken to be carried through by the others in the face of his objections. Nor were these objections on his part formal or unsubstantial; for it was entirely clear that on the 1st of October, 1872, unless means were found to pay off the first mortgage, the control of the road, no matter what lease might be made, would pass to the holders of the first mortgage bonds. And it was equally plain that a new organization under the statute of Vermont afforded the only means of getting an effective assent to the making of the proposed new lease. That Page and Williams were willing to do anything necessary to effect the new lease, with the assignment of the old, upon the enlarged rent, by which Page would personally benefit, may be taken to be true; but Morris, as it appears to me, upon the proof, declined to assent, and his holding the matter in suspense by the force of his suggestions, and the consequent acquiescence in nonaction of the other trustees, prevented the possibility of its being maintained that any bargain for a new lease received at that period the assent of any one capable of completely representing those interested in the property proposed to be leased. It seems to me, therefore, that no foundation at this period existed upon which a contract by parol can be asserted in favor of the Rutland Railroad Company, nor upon which anything in the nature of an estoppel in pais can be set up to prevent the free action of those in whom finally became vested the legal power of controlling the affairs of the new corporation when it came into existence. That this was the actual state of the case is shown by the agreement between the Rutland Railroad Company and the trustees and managers of the Vermont Central and Vermont & Canada Railroads, bearing date December 30, 1870, and by the action of the directors of the Rutland Company, and of its stockholders, in reference to that agreement, and also by the assignment of the Birchard and Page lease to the Rutland Company, and by that company to the trustees and managers of the Vermont Central and the Vermont & Canada roads.

First in order of time was the contract above mentioned, of December 30, 1870. The first eleven articles of this contract are occupied with the arrangements relating to the Rutland Railroad proper, and its management. Then comes a recital as follows: "Whereas, the Rutland Railroad Company, or parties in their interest, own and control certain railroads running in connection with the Rutland Railroad, and which are important to complete said lines, and for the development and protection of its traffic" (naming certain roads, and among them the Vermont Valley Railroad), and a further recital that it was important, for the interests of all concerned, that the management should be in the hands of the said trustees and managers of the Vermont Central and Vermont & Canada Railroads, along with the Rutland Railroad, in order to render the possession and control of the Rutland Railroad in the highest degree beneficial; and thereupon the parties of the first part (the Rutland Railroad Company) agree that the parties of the second part (the trustees and managers before mentioned) shall have the use and control of the Vermont Valley Railroad, and all other property and rights connected therewith, as described in the lease of the said railroad from Hamilton and others, trustees, to Page and Birchard, dated May 12, 1865, for 20 years from January 1, 1871, with the right to operate said railroad, and collect all the income therefrom. And the parties of the second part agree to pay to the parties of the first part, for the use of said railroad and property, at the rate of $65,000 per year during the remainder of the term provided for in the said lease, and after the expiration of said lease to pay to the party of the first part at the rate of $72,000 per annum while said railroad and property shall be held and enjoyed by the parties of the second part. Other parts of the instrument do not seem material to be stated, but it is apparent that the covenant of the Rutland Company, founded upon its reliance on parties in its interest to control the Vermont Valley Railroad, and not any contract existing, or supposed to exist, and entitling these parties to an extended lease, was the basis upon which they were dealing. In the same sense is to be interpreted the agreement for rent after the expiration of the existing lease, which is not for a definite period, like the engagement of the Rutland Company for 20 years from January 1, 1871, but only while the railroad should be held and enjoyed by the parties of the second part. On the next day (December 31, 1870) the Rutland directors (President Page in the chair, and Messrs. Butler, Chase, Birchard, Barnes, and Williams being the persons present) unanimously voted "that the president of the company be directed and authorized to execute, in its name and behalf, a contract or lease of their railroad and property, in connection with the other roads and lines, as well as to sell and transfer the supplies, fuel, lumber, contracts, and interests in said contracts named, to the managers of the Vermont Central and Vermont and Canada Railroads, for the purposes expressed in said contract, and upon the terms therein stipulated, which contract is dated the 30th day of December, 1870," upon certain condi-

tions, providing, among other things, that the corporation, at its adjourned annual meeting, assent, and that the court of chancery of Vermont allow such transfer and sale; and that the managers of the Vermont Central and Vermont & Canada Railroads should be authorized by the court of chancery to enter into the contracts, and also that it should be assented to and approved by the advisory committee of bondholders interested in trusts, and who were appointed by the court of chancery. The contract was accordingly assented to by the advisory committee mentioned. On the 5th of January, 1871, the court of chancery of Vermont, on the petition of the trustees and managers, dated on that day, made an order by which, after reciting the petition, and that the boards of directors of the Vermont Central and of the Vermont & Canada Railroad Companies, and the advisory committee of the first and second mortgage bondholders of the Vermont Central, had approved of the contract of December 30, 1870, and had assented to an order of the court approving the same, the court approved and confirmed the action of the trustees and managers in entering into said contracts, and directed them to go on and execute the same, and declared that the liabilities incurred by the trustees and managers under the contract were a charge upon the trust property and its earnings under the management of the trustees and managers.

On the 23d day of January, 1871, Page and Butler, by deed, assigned to the Rutland Railroad Company their lease of the Vermont Valley road for the remainder of their term, upon the engagement of the Rutland Railroad Company to pay the rent according to the lease, and also a further sum monthly to Page and Birchard, of $466.67. This deed was acknowledged on the 26th of January, 1871, and on that day an adjourned meeting of the stockholders of the Rutland Company was held. At this meeting the contract of December 30, 1870, was ratified, confirmed, and adopted by the unanimous vote of the stockholders present, and also the assignments and contracts entered into by the president in behalf of the company with the said trustees and managers relating to the Vermont Valley Railroad, and other roads therein mentioned, and also the assignment, dated January 23, 1871, of the lease of the Vermont Valley Railroad, which the resolution designates as authorized by a vote of the directors of this (the Rutland) company, dated December 3, 1870, and also various other leases and contracts, not material to be stated. On the 30th of January, 1871, the Rutland Railroad Company and the trustees and managers aforesaid entered into a further indenture, whereby the Rutland Company, after reciting various railroad leases in which it was lessee, and certain contracts into which it had entered, and also that Page and Birchard, on the 23d of January, 1871, had transferred to it their lease of the Ver-

mont Valley Railroad, dated May 12, 1865, and all their right and title thereto for the unexpired term, did assign, transfer, and set over to the said trustees and managers the said leases and contracts, and all right to the named terms of years unexpired under said leases, or either of them, as well as all interests, rights, and privileges acquired and existing, under or by virtue thereof, to said railroads, their real and personal property, or their management and control.

The Rutland Company does not attempt to transfer, or contract to transfer, to the trustees and managers, any interest in the Vermont Valley road, except the unexpired term of the lease to Birchard and Page. Anything further in that regard was left to the expectation of further action on the part of the parties who should become competent to act, and to the covenant of the Rutland Railroad Company in the contract of December 30, 1870. Looking at the structure of the various papers which have been stated, and the formal corporate action of the Rutland Company, the inference is strong that no one was misled, nor was there any intention to mislead any one, as to the actual relations of the parties contracting to the Vermont Valley Railroad. It was expected, undoubtedly, by the Rutland party, that, when the time should come that any one could act so as to control the Valley road, action would be taken which would subject that road to a further lease in favor of the Rutland and its assignees. But this rested in expectation alone, and had assumed no shape in which it could be laid hold of and enforced upon any principles administered in the courts. Morris, at least, among the parties in interest, had declined to enter into any contract, or semblance of a contract, in writing, upon the basis of a new or extended lease to the Rutland, and the matter had not been pressed by the other parties. There was but one interest which possessed the absolute control, and that was the first mortgage debt. The owners of that would, unless the debt was paid before October 1, 1872, become absolutely possessed of the road, and none of the other parties saw fit to make a further investment in money to the amount of that debt in order to secure beyond question the control of the road. They preferred to wait and see what would happen. Thus, at the consummation of the series of contracts and transactions which have been stated, no foundation existed upon which a demand for an extension of the lease of the Vermont Valley Railroad could be made against any representatives of the road, if any had then existed.

We are, in the next place, further to consider whether a right to such an extension ever came into existence. No steps appear to have been taken looking to the reorganization of the Valley Company after the resolution of the second mortgage trustees, December 13, 1870, until the preparation and

signing of the articles of association of the Vermont Valley Railroad Company of 1871, which bore date June 12, 1871, and which were formed with a view to action under the statute of Vermont before referred to. The articles of association were signed by the holders of $274,000 and over of the second mortgage bonds, the whole amount of which ever issued was $293,200. On the 3d of July, 1871, the majority of the directors named in the articles of association met and adopted by-laws, elected officers, and passed corporate resolutions, including that which conferred upon the president and treasurer authority to execute a lease to the Rutland Company, as before stated. The organization, however, was not formally completed by the filing of the articles of association as required by the statute, at least until the 29th of July, when they were filed in the office of the secretary of state, with the requisite affidavits sworn on the 7th and 10th days of July. As the proceedings of the meeting of July 3, 1871, went upon the minutes of the board as regularly transacted, and do not appear to have been subsequently brought in question by the board, I should regard them as being valid and operative, notwithstanding that they preceded the filing of the articles of association, and the completion of the acts necessary to create the corporation. Under the resolution respecting the lease, a draft of a proposed instrument was made by Mr. Prout, one of the directors and the solicitor of the corporation, and was given to Morris, the president, but it was never agreed to by the president and treasurer, nor by the corporation, nor was the paper ever executed, nor do its terms appear.

The first annual meeting of the stockholders of the corporation took place on the 20th of June, 1872, and the directors were all reelected. The stockholders also voted "to increase the capital stock $500,000, only for the purpose of raising funds to pay the amount due on the first mortgage, and that the president and treasurer be, and they are hereby, authorized, in case they can negotiate a sale thereof, to issue said stock, and sell the same at par, but paying not exceeding three per cent. brokerage in effecting a sale of said stock." By another vote the same officers were also authorized, in case the stock could not be so disposed of, to make a mortgage, and issue bonds, and dispose of the same. As nothing was done under this last resolution, except to ascertain that such bonds could not be negotiated, nothing further need be said upon the subject. The action of the stockholders in respect to the increase of the capital stock was intended to be taken under the authority conferred upon them by the laws of Vermont (Laws 1864, approved Oct. 31), by an amendment to chapter 28 of the General Statutes. It was there provided that any association which had been formed into a company under section 104 of chapter

28 might, at any meeting of the stockholders legally called for that purpose, increase the capital stock to any amount not exceeding double the amount of principal and interest of the bonds foreclosed, and designated in their articles of association. The attention of the company being subsequently directed to the fact that the meeting of the stockholders had not been called for the purpose of acting upon a proposal to increase the capital stock, a special meeting was called, on the 19th of August, for the 3d of September, by a proper notice, specifying its objects, which were (1) to see if the stockholders would vote to increase the capital stock of the company to an amount not exceeding $500,000, and (2) to see if the stockholders would vote to authorize a lease of their railroad and other property. Before this meeting was held, a negotiation had been entered into between Morris, the president, and a firm of brokers in New York (Fanshaw & Milliken), for placing the new stock on terms covered by the resolution.

Before closing the arrangements, Fanshaw & Milliken addressed to Morris, under date of August 23, 1872, a letter, saying that they required to be satisfied that the company had no lawsuits on hand or threatened, and was free from all contracts, duties, and obligations, except those of which Morris had spoken, viz. the first mortgage debt of $500,000, to be paid by the proceeds of the stock and the lease of the road to Birchard and Page. To this letter Morris replied, under date of August 24th, stating, in the name of the president and directors of the Vermont Valley Railroad Company of 1871, that there were no liens upon the corporation, and no suits against it, either on hand or in prospect; that the road was owned in fee simple by its stockholders, and that it had created no corporate debts, liabilities, or obligations whatsoever, excepting that the road came into their hands subject to the Page and Birchard lease for 10 years from June 1, 1865, and which had been assigned to the Rutland Railroad Company, and to the mortgage debt of $500,000, payable October 1, 1872; and that the stock was being sold to pay that indebtedness. Copies of these letters were sent to Butler, Prout, Williams, and Slate, directors; Page and Chase, the other directors, being absent from the country. Butler signed Morris' letter as it was. Prout added to Morris' letter the phrase, "and also excepting the agreement, if any, implied in the vote hereto annexed," and signed it, "J. Prout, Director, Aug. 30, 1872," and annexed a copy of the vote of July 3, 1871, in respect to the authority of the president and treasurer to make a lease. Williams and Slate answered substantially as Judge Prout had. These answers were sent to Fanshaw & Milliken, and received by them, prior to their agreeing to take the stock. Before their final answer to the proposition, and on the 3d of September, the special stockholders' meeting was held, in pursuance of the notice. At this meeting the resolution which had been

passed at the meeting June 20, 1872, for issuing the new stock, was unanimously adopted in the terms before stated. At the same meeting it was also voted "that the president and treasurer, before signing a lease of our railroad, shall call a meeting of the stockholders, and submit a draft of said lease for their approval." Of these resolutions, Fanshaw & Milliken were at once notified; and they were also aware of the agreement between the Rutland Railroad Company and the trustees and managers, before mentioned. On the 7th of September the proposition to buy the stock at 97 was accepted in writing by Fanshaw & Milliken, and by the Vermont Valley Railroad Company of 1871, by Morris, its president; and on or before September 12th the $485,000 was, in pursuance of the contract, paid in to the Union Trust Company of New York, to the credit of the trustees of the first mortgage bonds, and the 10,000 shares of additional stock were soon after, and on the 12th of September, issued to the purchasers.

At this time, according to the views which have been expressed in the progress of this opinion, no legal or equitable obligation existed upon the Vermont Valley Railroad Company of 1871 to permit possession of its road to be retained by the Rutland Railroad Company, or its assigns, after the termination of the Page and Birchard lease. No lease had been executed, nor had there been any individual or corporate action which bound the company to assent to the agreement which the Rutland Company had entered into with the trustees and managers of the Vermont Central and the Vermont & Canada Railroad Companies. And at this time a new element had come into the Valley road of 1871, by means of the new issue of stock, which, being in itself a majority of the whole stock then existing, was entitled to its just influence in the management of the corporate affairs; and this consideration is not diminished in force by the fact that the money thus paid removed and replaced the mortgage debt, the holders of which, but for its payment, held the mastery over the affairs of the corporation. It could not be naturally supposed that these new stockholders paid half a million of dollars for stock, at 97, which was to pay only 7 per cent. on the par of the shares, merely in order to stand on an exact equality in income with a nearly equal amount of stock which had been taken at something less than 59 per cent., viz. 3²/₅ shares for each $100 of principal of bonds given up and paid for in second mortgage bonds at par, which, in the market, are said to have been held at 50 per cent. As the shares were $50 each, the one set of stockholders paid $48.50 a share; the others, about $14.75. Every one who knew of the transaction must have understood that this could not be the purpose of the purchasers. Assuming that they bought subject to all the legal and equitable rights of the Rutland Company and its assignees, we have seen that these were, in regard to an extended or further lease, mere expectations

and desires, and not rights. The purchasers took all the precautions in the way of inquiry which were likely to prove available, and they were not told, in reply, that any equitable or other right existed, but were referred to "an agreement, if any, implied in a resolution" which carried with it no implication of an agreement. And therefore, if at the time of the purchase it was possible to acquire this new stock free from any equitable claim for a new lease or an extended possession, these purchasers so conducted the transaction as to occupy that position. But, in my opinion, no equity existed which bound the company itself. It remained free to act upon its own view of its own interest. That its managers had thought a new lease advantageous did not bind them to continue to think so, unless there was a contract with another party to that effect. No moral obligation was imposed on the purchasers to continue the connection with the Rutland road. It was equally right to connect with either set of roads, and the new purchasers were as free to seek the control of the road in order to form new connections as the original stockholders had been to form the old connection.

The directors in office when the new stock was issued passed no resolution directing a lease to be executed, nor affirming or ratifying any supposed contract for a future lease. But at their meeting November 7, 1872, they again adopted a resolution, expressed to be in accordance with former votes, authorizing the president and trustees to execute and deliver to the Rutland Company a lease of the Valley road, with the usual covenants, following the language of the resolution of July 3, 1871; and on the same day Williams, the treasurer, executed, as has been before stated, the lease dated August 8, 1871, on behalf of the Vermont Valley Railroad Company of 1871,—Morris, the president, refusing to execute, and the vice president, Page, who was also the president of the Rutland Company, executing on its behalf, without, as far as is shown, any authority to do so. At the same meeting, however, two resolutions were passed, which are important to be stated, as bearing upon the position of the parties. They were as follows: "Voted, that the president and clerk be, and they are hereby, directed not to call any special meeting of the stockholders without the direction of the board in meeting convened for that purpose. Voted, that the president and clerk be, and they are hereby, directed to call the next annual meeting of this company at Bellows Falls, in the month of December, 1873, and on such day in said month as the board may determine." The effect of these two resolutions, if they were operative, was to prevent any special meeting of the stockholders, except at the will of the directors, and also to postpone the annual meeting, which the by-laws appointed to be held in June, until the succeeding December, and

until such day in that month as the board might determine. By the postponement of the annual meeting, the election of directors in place of the board elected June 20, 1872, would also be postponed, and those in office would be continued in their places indefinitely, until it should please the same directors to allow the stockholders the opportunity of choosing others. I am persuaded that these changes or attempted changes were made, not merely because some of the directors and large stockholders were likely to be absent, but in order that the holders of the new stock might be precluded from enjoying their just authority as owners of the majority of the stock, and from preventing the execution of any new lease to the Rutland Company, except by an appeal to the courts. Subsequently, the new stockholders holding 10,000 shares of stock, and one of the old stockholders, having 893 shares, applied to the president to call a meeting of the directors to act upon their application for holding the annual stockholders' meeting in June, 1873. The president made the call for a meeting of the directors to be held at his house near New York, but no one attended, although notices thereof were given.

In May the same shareholders applied to the president to call the annual stockholders' meeting, which he did for the 27th of June, 1873, at Bellows Falls. The shareholders representing 12,299 shares appeared in person or by proxy at the meeting, but, it appearing that an injunction against the holding of an election had been served, the meeting was adjourned to the 21st of July, at the same place. At the adjourned day the same stockholders, except one who held 184 shares, attended; and, the injunction having been dissolved, they proceeded to an election, at which all the votes (being those representing 12,115 shares) were given for Morris, Bernall, Harris, Billings, Nash, Rockwell, and Waite, who all, save Morris, were new directors. The shareholders further unanimously resolved that no lease whatever of the Vermont Valley road, either to the Rutland Railroad Company, or to any other party, be made, contracted for, or ratified, until the same shall first have been authorized by vote of the stockholders of this company, in a meeting duly convened for that purpose. The board of directors thus chosen organized themselves by selecting Morris to be president, and others to the other corporate offices. Various demands were made upon the other board and the officers chosen by it, and notices were given to the parties concerned of what had been done, and finally the new board was requested, by Bernall, Robinson, Pond, and Mather, to bring a suit in the courts of Vermont, which the board, on the 13th of January, 1874, declined to do, and this suit was the consequence.

Under the circumstances disclosed in this case in connection with the issue of the new stock, and the vote of the stockholders in regard to a lease, which accompanied the resolution for its issue, and the substantial fact that all the directors but Morris were connected in interest with the Rutland road, action to give a lease against the will of the majority of the stockholders ought to be regarded as a breach of trust on the part of the directors, restrainable by injunction, within the principles of Dodge v. Woolsey, 16 How. [57 U. S.] 331, and the other cases cited and referred to by Judge Woodruff in his opinion in this case. Pond v. Vermont Val. R. Co. [Case No. 11,265].

Courts of equity do not ordinarily entertain questions of the regularity of corporate elections, or of the title to corporate offices. But when such an inquiry becomes incidentally necessary, in order that complete justice may be done in respect to a controversy over which they are compelled to take jurisdiction, they will not shrink from the duty. In this view, I think it necessary to consider which organization is entitled to be regarded as the board of directors of the Valley road of 1871.

The provisions of the by-laws which bear upon the subject of stockholders' meetings are contained in articles 1 and 2, and are as follows: "Article 1. The annual meeting of the stockholders of this association shall be held in the month of June, or at such other time as the directors may order. Art. 2. The annual and all special meetings of the corporation shall be called by the president or clerk, unless otherwise ordered by the directors, by giving at least ten days' notice of the same, and the purpose thereof, in one newspaper published in Windham county, and by mailing a notice to the address of each stockholder." Under this latter article, the power of the directors to "order otherwise" relates either to the officers who are designated to call meetings, or to the length or mode of notice to be given. In regard to the annual meeting, the action of the directors at their meeting of November 7, 1872, did not designate other officers, nor different notice, than article 2 of the by-laws had prescribed.

The alteration, if any was effected, was in the time for holding the annual meeting. That, by the first article, was fixed in the month of June, "or at such other time as the directors may order." The directors ordered that it should be called in December, 1873, and on such day in that month as the board should determine. Substantially, therefore, it was a declaration on the part of the directors that no annual meeting should be held until they chose to direct, and to be held at a day not earlier than December, 1873. This was not, in my opinion, a fixing of the time for the annual meeting, within the meaning of the by-laws, and it therefore left the by-laws in force as originally adopted. The power to hold the annual meeting at or about the period designated by the by-laws was of the utmost consequence to the safety of the rights of the stockholders, since in this way

only could they cause their will in respect to the management of their property to be regarded. A court will therefore look carefully at any attempt to defeat the exercise of this power, and will be even astute to lay hold of any ground to sustain the substantial control in the hands of the stockholders. I think, therefore, that the action of the president, in pursuance of a request of a majority of the stockholders, in calling the annual meeting in June, 1873, was regular, and that the board of directors chosen at the adjourned meeting in July after that period, were lawfully chosen, and became the regular organization of the Vermont Valley Railroad Company of 1871. Its successors are to be recognized as being the board of directors of that corporation.

In the view which has been taken of the rights of the parties on the expiration by lapse of time of the lease to Page and Birchard, all pretext for longer retaining possession by or under the Rutland Railroad was at an end. The trustees under the first mortgage had received funds amply sufficient to extinguish all possible balance remaining unpaid upon those bonds, or to them as trustees, and there was no obstacle to putting the corporation in possession of the road. Neither the trustees and managers of the Vermont & Canada, and the Vermont Central Railroads, nor their successors, the Central Vermont Railroad, had any title after the expiration of the lease to Page and Birchard; and there seems to be no reason why the court should not proceed to do complete justice between the parties, although the term did not expire until after the commencement of the suit. The whole merits have been tried in this suit, and to turn the parties over to another is quite unnecessary, and contrary to the rule by which a court of equity seeks to do complete justice, when, for any cause, it has once taken cognizance of a controversy. I am persuaded that the court of chancery of Vermont has not undertaken to extend a receivership against persons who are strangers to the controversy in which it was created, and over property not involved in such suit, and that any permission to make contracts given to the officer of the court was only intended for his protection in accounting.

The decision in the case of Vermont & C. R. Co. v. Vermont Cent. R. Co., 46 Vt. 794, extended only to the case of a party to the suit in which the receiver was appointed bringing an action against the receiver. In that case the party was enjoined from continuing the suit. Moreover, it is no bar to a suit in one jurisdiction that bringing it may be regarded as a contempt in another. It is for the court whose authority a party has disregarded to vindicate its own authority. Upon the whole case, there must be a decree for the plaintiffs in the suit first above entitled; among other things, declaring the lease executed by Williams and Page in-

operative, and directing the same to be canceled, and enjoining the execution of any like lease, and also directing the trustees of the first mortgage to pay over any sum remaining in their hands after satisfying their just claims (as to which a reference will be directed to a master) to the corporation of 1871, represented by the directors who have succeeded to those elected in July, 1873, and also that the said corporation be let into possession of the Valley road, and the other property, if any, now held by the defendants, or either of them, belonging to said corporation, with costs, etc. This decree is to be settled upon notice. In the other suit, in which Chase and Butler are plaintiffs, a decree must be entered dismissing the bill, with costs.